WEST PENN POWER COMPANY *et al.* v. BOARD OF REVIEW AND EQUALIZATION OF BROOKE COUNTY

(No. 7300)

Submitted May 25, 1932. Decided June 7, 1932.

*Steptoe & Johnson, Handlan, Garden & Matthews, M. F. Millikan* and *W. D. McKinney* for appellants.

*John T. Simms,* for appellee.

MAXWELL, JUDGE:

This is an appeal from the circuit court of Brooke County affirming an assessment for taxation made by the board of review and equalization of that county.

West Penn Power Company and Ohio Power Company, appelants, own jointly a large electric plant known as the Windsor plant. For the year 1931, the owners made a return of said property for taxation purposes on substantially the same basis as had been used for 1930. The 1931 return for ''Windsor power house tract, machinery and equipment, structures and personal property located thereon'' was $7,121,274.00. This included $497,000.00 personal property not involved in this controversy; also $26,300.00 valuation of the land upon which the plant is located. The assessor of Brooke County entered the property for taxation at values thus returned by the owners.

The board of review and equalization becoming dissatisfied with this assessment, notified the owners that a hearing would be had as provided by statute. Code 1931, 11-3-24. Following the hearing, the board assessed the properties of the appellants at $10,000,000.00, exclusive of the said item of $497,000.00 personal property. The assessment of $10,000,000.00 is composed of two items: plant proper, $9,790,400.00; other land and improvements, $209,600.00. The appellants say that the item of $9,790,400.00 is far in excess of the true and actual value of the plant.

Our assessment law provides: ''All property shall be assessed annually as of the first day of January at its true and

actual value; that is to say, at the price for which such property would sell if voluntarily offered for sale by the owner thereof, upon such terms as such property, the value of which is sought to be ascertained, is usually sold, and not the price which might be realized if such property was sold at a forced sale." Code 1931, 11-3-1.

At the hearing, the appellant introduced evidence tending to show that the true and actual value of the Windsor plant as of the first of January, 1931, was (in round numbers) from $5,000,000.00 to $6,000,000.00. This testimony was given by four expert witnesses, trained and experienced in the construction and operation of electric power plants. Their estimates vary somewhat.

This plant, of 180,000 kilowatts capacity, cost about $18,000,000.00. The first unit was put in operation in 1917, the second in 1918, the third and fourth in 1919, and the fifth and sixth in 1923. It was designed in 1915. Thus, on January 1, 1931, it was sixteen years old in design, and its several units had been in operation for the average period of ten and eight-tenths years. Appelants' witnesses say that actual deterioration of a plant of this sort is not serious, that a depletion charge of about two per centum per annum would probably take care of that item. But, from their view, the great shrinkage in value lies in obsolescence.

It is testified that although the plant was of the most approved possible design at the time its construction was begun in 1917, the developments and improvements in power plant construction in the last fifteen years have rendered this plant inadequate in comparison with a plant of present design; that a new and modern plant of the same capacity would cost about $14,400,000.00, as of January 1, 1931, and that its operating cost would be about $871,000.00 less per year than the operating cost of the existing plant. From all of which it is deduced by appellants that the true and actual value of the plant as of January 1, 1931, was not in excess of $5,609,200.00. Their reasoning is forceful and the methods of calculation and deduction are clear and precise. But have appellants and their witnesses taken all proper elements of value into consideration?

The appellants, in operation of their jointly owned plant, do not occupy the status of regulated utilities. They are manufacturers selling the output of this plant to other companies. The plant is a link in each of two larger power systems. It is in evidence, however, that inasmuch as the appellants have each built more modern plants than the Windsor plant, it no longer ranks as a base-load plant. A witness testified: ''It is not the plant which we keep loaded to the maximum. Windsor has come to the place where it is just used as a peak carrying capacity plant.'' He says that it costs more to make power at Windsor than at other more recently built plants. But however this may be, the going concern value of this plant cannot be ignored in a proper assessment for taxation.

The record is not satisfactory as to either the gross or the net earnings of this plant. From a minute of the board it appears that a representative of the Tax Commissioner, in attendance at the hearing, requested that the appellants furnish a statement showing, among other things, the gross and net incomes derived from the plant. The request was not complied with. But it does appear from the record that the appellants pay annually to the State of West Virginia between eight and nine thousand dollars gross sales tax on the electric energy produced at this plant. The basis upon which this tax was paid was 21/100 of one per centum of the gross proceeds of sales. Code 1931, 11-13-2 (b). If the application of this rate produced the tax amounting to between eight and nine thousand dollars, say eighty-five hundred dollars, the gross sales amounted to a little over $4,000,000.00. Deducting therefrom the annual operation cost of a little more than $2,000,000.00 as testified on behalf of appellants, there remains about $2,000,000.00 net. These figures are not recited here as precise and accurate but the record warrants the belief that they are approximately correct. Now if this plant is experiencing a net annual income of anyways near $2,000,000.00, it is earning a very splendid return on the investment. Its earning capacity is great; its going concern value is necessarily high. The board of review and equalization properly took into consideration these very valuable elements.

These are intangible elements, and the estimation of the value of such is always involved in more or less uncertainty. We perceive, however, no basis on which we could properly say that the board erred to the prejudice of the appellants when it added to the material values testified to by appellants' witnesses a sufficient sum representing intangible values to raise the total to $10,000,000.00.

Matters of this sort are primarily administrative. By virtue of statute they are appealable here where the assessment is $50,000.00 or more. Code 1931, 11-3-25. Though doubting the right of the legislature thus to clothe this court with authority and duty of reviewing assessments we have submitted to it because of long practice. *Hodges* v. *Public Service Commission,* 110 W. Va. 649, 654, 159 S. E. 834. But in no event should we assume to disturb such finding "when supported by substantial evidence unless plainly wrong." *Coal Co.* v. *Bassett,* 108 W. Va. 293, 150 S. E. 745. We think the assessment made by the board is not plainly wrong, and to the contention of counsel that the said finding is not supported by substantial evidence, we reply that the earning capacity of this plant as deduced from the showing in the record as to its annual gross sales tax paid to the State of West Virginia, is sufficient basis for a very positive going concern value.

There remains for consideration a problem to be determined in the light of the "equal protection of the laws" clause of the Fourteenth Amendment of the Constitution of the United States. The matter arises in this way. On the appeal, the circuit court of Brooke County decreed the assessment of $10,000,000.00 on the plaintiff's plant and real estate, as ascertained by the board of review and equalization, to be the true and actual value of said property. It is in evidence that since 1916, the real estate of the county has been assessed at about eighty per centum of its value. Appellants say that to assess their properties at one hundred per centum of their true and actual value, as ascertained by the board and the circuit court, while other properties generally are valued at eighty per centum of their true values, is a denial of the equal

protection of the law, and therefore an unconstitutional discrimination against appellants.

Is the evidence sufficient to establish such discrimination? All there is in the record on this point of an affirmative nature appears in the testimony of the assessor of Brooke County. Called as a witness by appellants he was interrogated principally as to whether there had been any general fluctuation in assessment valuations in that county. He answered in the negative. On cross-examination by the chairman of the board, the witness made mention of an eighty per centum basis of value for assessment. Then, on re-direct examination by counsel for appellants, these questions and answers appear in the record: "Q. Mr Smith, you said something about 80 percent. What do you mean by that? A. That is supposed to be the book value. Q. What do you mean by 'book value'? A. Well, if a property is worth $5,000 we take 80 per cent of that. Q. For what? A. For assessing purposes. Q. How long has that custom been in practice in this county? A. Oh, I don't know. Ever since I had the books, back in 1916."

No explanation of this condition is attempted by the board or by anyone in its behalf. It is not denied and no effort is made to show that the assessor was mistaken in his statement.

Careful examination of the minutes of the board for its sessions extending through the month of July, 1931, does not disclose any action taken by it to raise assessments generally or even to consider generally the valuations of real properties as fixed by the assessor.

Under the law, it is the duty of the assessor to assess property at its true and actual value. There is, of course, a general presumption that public officials do their duty as required by law, but here we have direct and uncontradicted evidence that a different basis than that of true and actual value has been generally employed in Brooke County for fifteen years. The presumption must yield to the fact as proved and undisputed.

A leading case on this subject is *Sioux. City Bridge Co.* v. *Dakota County*, (Neb.) 260 U. S. 441, wherein the court said:

> "This court holds that the right of the taxpayer whose property alone is taxed at 100 per cent of

> its true value is to have his assessment reduced to the percentage of that value at which others are taxed, even though this is a departure from the requirement of statute. The conclusion is based on the principle that where it is impossible to secure both the standards of the true value, and the uniformity and equality required by law, the latter requirement is to be preferred as the just and ultimate purpose of the law. In substance and effect, the decision of the Nebraska supreme court in this case upholds the violation of the 14th Amendment to the injury of the Bridge Company. We must, therefore, reverse its judgment."

Many other cases, both federal and state, are in accord: See as typical: *Sunday Lake Iron Co.* v. *Wakefield,* 247 U. S. 350; *Knox* v. *Southern Paper Company,* (Miss.) 108 So. 288; *Randals* v. *State,* (Tex.) 15 S. W. (2d) 715; *Bank* v. *Schlotzhauer,* (Mo.) 298 S. W. 772, 55 A. L. R. 489. See note 55 A. L. R. 503.

In the *Sioux City Bridge* case the supreme court of Nebraska had held that "when property is assessed at its true value, and other property in the district is assessed below its true value, the proper remedy is to have the property assessed below its true value raised, rather than to have property assessed at its true value reduced." Of that finding the Supreme Court of the United States in the decision *supra* said that such a result "is to deny the injured taxpayer any remedy at all, because it is utterly impossible for him, by any judicial proceeding, to secure an increase in the assessment of the great mass of underassessed property in the taxing district."

In the *Southern Paper Company* case, *supra,* the supreme court of Mississippi said: "Where there is a systematic scheme by the assessing officers of a state to assess property for taxes generally below its true value, a taxpayer whose property is assessed at full value is thereby deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment of the Federal Constitution." The supreme court of Texas thus covers the proposition in the *Randals* case, cited: "To assess the property of one or a few owners

at a materially higher percentage of its value than the percentage of the value at which the property of a great majority of the owners in the county is assessed is unconstitutional, and, especially if done in pursuance of some custom, system, or scheme in which values are not ascertained as provided by law.''

We are of opinion that the instant case comes plainly within the principle of law thus generally recognized and applied. The existence of the discrepancy appears clearly in the evidence. The fact that the assessor in his testimony unequivocally states that a basis of eighty per centum had been generally employed instead of a true and actual value basis, brings this case within the rule as stated in cases cited that a complaining party is entitled to relief even though the advantage which other property owners have enjoyed has come to the them by reason of a disregard of statutory requirements by public officials.

We therefore reverse the order of the circuit court and remand the proceeding with direction that the assessment of $10,000,000.00 of real estate and improvements be reduced twenty per centum and that on that basis apportionment be made to the two owners as their interests may appear.

*Reversed and remanded.*

LITZ, JUDGE:

I concur in the conclusion of the court that the valuation of appellants' property for taxation is not in excess of its true and actual value as defined by the statute, but I cannot subscribe to the theory advanced by the majority that the power companies have been denied the equal protection of the law in violation of the Fourteen Amendment to the Federal Constitution.

Upon the uncertain testimony of the assessor, introduced as a witness for the power companies, which, it is claimed, amounted to the statement that he had established a practice of assessing property for taxation at eighty per centum of its true and actual value, the majority of the court finds as a solemn fact that all other properties in Brooke County were assessed for 1931 at eighty per centum of their true

and actual value. His evidence, however positive, is not admissible for the purpose of attacking the validity of his official acts. "An officer, when he performs an act, in the course of his official duty, cannot be heard to say what he intended thereby. The law attaches consequences to the act, without reference to the private intention of the officer. He has no power to explain away his legal acts, or their legal effect. To do so, would give effect to the intention of the officer rather than the law." 22 R. C. L. 474. ' But ignoring a positive, salutary rule of procedure, by accepting the stultifying statement of the assessor, such evidence has no probative value in a determination of the ultimate fact as to whether the board of review and equalization, the final arbiter, has discriminated against the power companies in exercising its authority and mandatory duty of fixing the value of all property for taxation at its true and actual value. The valuation by the assessor is merely tentative. Section 24, article 3, chapter 11, Code 1931, requires the board to "pass upon each valuation and each interest"; to enter the valuation of "each as fixed by it in a separate column in the land and personal property books prepared for the purpose"; and to reduce or increase to its true and actual value any property or 'interest assessed by the assessor at more or less than its true and actual value. There is not the slightest evidence that the board ignored its mandatory duty of fixing the valuations of all other properties in the county at their true and actual value. The opinion, however, seeks to avoid the legal conclusion that the board has performed this duty, by stating merely that an inspection of part of its minutes for 1931 "does not disclose any action taken by it to raise assessments generally or even to consider generally the valuation of real properties as fixed by the assessor." I do not doubt the law cited, but I protest its application, without facts, in a matter vitally affecting the public.

Judge Woods concurs in this note.