446 S.E.2d 912

**In re the Petition of MAPLE MEADOW MINING COMPANY FOR RELIEF FROM REAL PROPERTY ASSESS-MENT FOR the TAX YEAR 1992.**

**No. 21900.**

Supreme Court of Appeals of West Virginia.

Submitted May 11, 1994.

Decided July 8, 1994.

John A. Mairs, Jackson & Kelly, Charleston, for Maple Meadow Min.

Carl W. Roop, Canterbury, Poling & Roop, Beckley, for Raleigh County Com'n.

Darrell V. McGraw, Jr., Atty. Gen., Barry L. Koerber, Asst. Atty. Gen., Charleston, for W. Va. Tax & Revenue.

McHUGH, Justice:

This case is before this Court upon appeal of the January 20, 1993, order of the Circuit Court of Raleigh County. In that order, the circuit court affirmed the appellee's, the Raleigh County Assessor's (hereinafter "county assessor") tax assessment of the appellant's, Maple Meadow Mining Company (hereinafter "Maple Meadow"), real property which consists of coal reserves in Raleigh County. On appeal, Maple Meadow asks that this Court

reverse the order of the circuit court and order that this case be remanded to the circuit court with instructions to reduce the assessment on Maple Meadow's natural resources property.[1] For the reasons stated below, the decision of the circuit court is affirmed.

## I

Prior to 1990, property in the State of West Virginia was sometimes valued at less than the current market value or assessed at a percentage lower than sixty percent of the market value. The legislature saw the need to ensure equality among property valuation and assessments. Thus, in 1990, the Fair and Equitable Property Valuation Act (hereinafter "the Act") was enacted by the legislature to require reappraisal of property in West Virginia for tax purposes. *See W.Va. Code*, 11–1C–1, *et seq.* The findings of the legislature setting forth the purpose of the Act are found in *W.Va.Code*, 11–1C–1(a) [1990], which states, in part: "The Legislature hereby finds and declares that all property in this state should be fairly and equitably valued wherever it is situated so that all citizens will be treated fairly and no individual species or class of property will be overvalued or undervalued[.]" Under the Act, such equality in property valuation is to be achieved by the end of a three-year cycle. *W.Va.Code*, 11–1C–1(d) and 11–1C–7(d) [1990]. Specifically, at the end of the three-year cycle, July 1, 1993, all property is to be annually assessed at sixty percent of its then current fair market value. *W.Va.Code*, 11–1C–1(d) [1990].

The succeeding sections of this article set forth policies and procedures to be followed by county and state personnel in order to establish and maintain fair and equitable property values. Pursuant to *W.Va.Code*, 11–1C–7 [1990], county assessors are to employ the methodologies set forth in this Act and the valuation system established by the tax commissioner in order to adopt a county valuation plan and appraise all real and personal property in their jurisdiction at fair market value. However, property that is to be valued by either the tax commissioner under *W.Va.Code*, 11–1C–10 [1990] or the board of public works under *W.Va.Code*, 11–6–1, *et seq.* is excluded from this section. More specifically, *W.Va.Code*, 11–1C–10 [1990], requires the tax commissioner to value all natural resource property and industrial property throughout the state, while *W.Va. Code*, 11–6–1 [1986] requires the board of public works to value properties such as railroads, toll bridges, car line companies, pipeline companies, express companies and telegraph and telephone companies.

Raleigh County's valuation plan provided that the county assessor would reappraise a portion of the property located within the county on a district by district basis. Furthermore, the plan provided for all real property assessments within the county to be phased in, starting at approximately thirty percent for the 1990–91 tax year, forty percent for the 1991–92 tax year and fifty percent for the 1992–93 tax year in order to achieve a sixty percent assessment rate by July 1, 1993.

In January, 1992, the county assessor, through publication in the local newspaper, notified the citizens of Raleigh County of the ensuing increase in the assessed valuation of all real property in the county. Ultimately, the assessed valuation of all real property was increased 24.61% for the 1992 tax year in order to achieve the forty percent assessment value for the 1992 tax year; but, assessments for property falling within the natural resources sub-class automatically received a sixty percent assessment rate, because the assessor had the county's oil, gas and other mineral properties placed at sixty percent from the outset of the implementation of the Act.

Maple Meadow's natural resources property, as attested to by Maple Meadow, was

---

**1.** *W.Va.Code*, 11–1C–10(a)(2) [1990] defines "natural resources property" as "coal, oil, natural gas [etc.]." *W.Va.Code*, 11–1C–10 was amended in 1994; however, the amendments do not affect the case before us.

assessed at $763,350 for the 1991 tax year. The assessment increased for the 1992 tax year to $7,112,647.20, sixty percent of $11,-854,412, the reappraised value of the property as determined by the tax commissioner. Maple Meadow challenged the 1992 assessment on the grounds that the county assessor violated *W.Va.Code*, 11–1C–7(d) [1990]. Maple Meadow asserted that the assessment was discriminatory, nonuniform and unconstitutional. On February 24, 1992, a hearing was held before the Raleigh County Commission, sitting as the Board of Review and Equalization (hereinafter "the Board"). On February 27, 1992, the 1992 assessment of Maple Meadow's natural resources property was affirmed by the Board. Maple Meadow appealed this decision to the Circuit Court of Raleigh County on March 30, 1992; and, by order dated January 30, 1993, the circuit court affirmed the 1992 assessment. It is from this order of the circuit court that Maple Meadow appeals to this Court.

## II

The primary focus of this case is on the assessment rate used for Maple Meadow's natural resources property. Our state's Constitution proclaims that all property is to be assessed at sixty percent. *W.Va. Const.* art. X, § 1b. The legislature, in an attempt to equally value and assess all property, implemented the Fair and Equitable Property Valuation Act. The legislature recognized, within *W.Va.Code*, 11–1C–1 [1990], that the three-year phase-in cycle is essential to achieve equality of assessed valuation among the state's counties and the process to achieve this equality is not violative of *W.Va. Const.* art. X, § 1, which calls for equal and uniform taxation throughout the state.[2]

**2.** As we previously mentioned above, prior to the enactment of this article, some property within the state was appraised at less than the current market value and was assessed at a percentage lower than sixty percent. Thus, the enactment of this article can adversely affect taxpayers in one of two ways. Property value will most likely increase if it was previously valued at less than the current market value; or, the assessed value of their property may increase since not all property was assessed at the requisite sixty percent.

Because Maple Meadow is arguing that a statute within the Act has been violated by the county assessor, an examination of the relevant statutory provisions is warranted. We note that tax statutes are often not models of clarity, and the tax statutes within this Act appear to be no different.

The legislature's objectives and goals are set forth in *W.Va.Code*, 11–1C–1(c) and (d) [1990]:

(c) The Legislature finds that requiring the valuation of property to occur in three-year cycles with an annual adjustment of assessments as to those properties for which a change in value is discovered shall not violate the equal and uniform provision of section one, article ten of the West Virginia Constitution, the Legislature further finding that such three-year cycle and annual adjustment are an integral and indispensable part of a systematic review of all properties in order to achieve equality of assessed valuation within and among the counties of this state. Notwithstanding such finding, the Legislature intends to permit the assessors and the board of public works to place proportionately uniform percentage changes in values on the books during the two tax years preceding the tax year beginning on the first day of July, one thousand nine hundred ninety-three, in accordance with the provisions of section seven [§ 11–1C–7] of this article.

(d) The Legislature deems that the goal of this article is that by the end of the three-year cycle contemplated by this article, and thereafter from year to year, all property shall be annually assessed at sixty percent of its then current fair market value except for the values derived for farms and managed timberland properties,

In the case before us, we note that Maple Meadow does not challenge the method employed by the tax commissioner in determining the now current market value of their property. *See Western Pocahontas Properties, Ltd. v. County Commission of Wetzel County,* 189 W.Va. 322, 431 S.E.2d 661 (1993) (Valuation of coal reserves based upon legislative regulation is presumed correct.)

which are to be valued as prescribed by this article one-c and article four [§§ 11–1C–1 et seq. and 11–4–1 et seq.] of this chapter.

The methodologies to be employed by county assessors to achieve the very purpose of the Act is set forth in *W.Va.Code*, 11–1C–7 [1990]. Subsection (d) of this provision, the controversial provision herein, states as follows:

Upon approval of the valuation plan, the assessor shall immediately begin implementation of the valuation process. Any change in value discovered subsequent to the certification of values by the assessor to the county commission, acting as the board of equalization and review, in any given year shall be placed upon the property books for the next certification of values: Provided, That notwithstanding any other provision of this code to the contrary, the property valuation training and procedures commission may authorize the tax commissioner to approve a valuation plan and the board of public works to submit such a plan which would permit the placement of proportionately uniform percentage changes in values on the books that estimate the percentage difference between the current assessed value and sixty percent of the fair market value for classes or identified sub-classes of property and distribute the change between the two tax years preceding the tax year beginning on the first day of July, one thousand nine hundred ninety-three. This procedure may be used in lieu of placing individual values on the books at sixty percent of value as discovered, or may be in addition to such valuation. If such procedure is adopted by a county, then property whose reevaluation is the responsibility of the board of public works and the state tax commissioner shall have its values estimated and placed on the books in like manner. Such estimates shall be based on the best information obtained by the assessor, the board of public works and the tax commissioner, and the changes shall move those values substantially towards sixty percent of fair market value, such sixty percent to be reached on or before the first day of July, one thousand nine hundred ninety-three.

On appeal, Maple Meadow contends that the circuit court erred in failing to order the assessment of Maple Meadow's natural resources property for tax year 1992, "in like manner" as accorded to other real property pursuant to *W.Va.Code*, 11–1C–7(d) [1990]. Maple Meadow, therefore, argues that such disparity in treatment is violative of article X, section 1 of the *West Virginia Constitution* and amendment XIV, section 1 of the *United States Constitution.*

■ We begin by setting forth the standard to be applied in challenging assessments:

'It is a general rule that valuations for taxation purposes fixed by an assessing officer are presumed to be correct. The burden of showing an assessment to be erroneous is, of course, upon the taxpayer, and proof of such fact must be clear.' Syl. pt. 7, *In re Tax Assessments Against Pocahontas Land Co.*, 172 W.Va. 53, 303 S.E.2d 691 (1983).

Syl. pt. 1, *Western Pocahontas Properties, Ltd. v. County Commission of Wetzel County*, 189 W.Va. 322, 431 S.E.2d 661 (1993). The burden clearly falls upon Maple Meadow to demonstrate through clear and convincing evidence that the tax assessments were erroneous.

In this case, Maple Meadow begins by contending that the 1992 assessment of its natural resources property is in violation of *W.Va.Code*, 11–1C–7(d) [1990] and the Raleigh County valuation plan. Maple Meadow asserts that this section gives the county assessor the option of either placing changes in property value on the property books at sixty percent of value or phasing in any increases in value as discovered as a result of the reappraisal during the three-year reappraisal period; further, if the county assessor chooses the phase-in option, the county assessor must also phase in any increases in

the property that the tax commissioner is responsible for appraising in "like manner." Maple Meadow argues, that because the county assessor elected to use the phase-in option on all other real property within the county, the county assessor must also assess Maple Meadow's natural resources property in the same manner. Thus, Maple Meadow asks that the county assessor be required to follow the county's valuation plan in compliance with *W.Va.Code*, 11–1C–7(d) [1990] so that Maple Meadow is treated the same as all other Raleigh County real property owners.[3]

As the county assessor and the tax commissioner suggest, Maple Meadow essentially is asking the county assessor to lower Maple Meadow's assessment rate to forty percent for the 1992 tax year and then ultimately raise it to sixty percent by 1993. The county assessor and the tax commissioner maintain that the language within *W.Va.Code*, 11–1C–7(d) [1990], which focuses on the procedural and methodical aspects of achieving the sixty percent assessment goal, does not require the county assessor to lower the assessments that were at sixty percent from the outset of the implementation of the Act, but rather allows the county assessor to choose an option to bring all other properties within the sixty percent assessment rate and treat other classes of assessed properties in like fashion. Thus, the county assessor and the tax com-

missioner submit that other classes of real properties were not at sixty percent and the county assessor had to raise the percentages on these properties to the levels set forth in the plan for each respective year; however, it was not necessary for the county assessor to adjust the assessment percentage of sixty percent on Maple Meadow's natural resources property in that Maple Meadow's natural resources property, along with all other natural resources property within the county, was from the outset of the implementation of the Act at the statutory and constitutional goal of sixty percent.

We agree with the county assessor's and the tax commissioner's contentions regarding the county assessor's method of determining the assessed valuation of the property within Raleigh County. We believe that the methodologies and the resulting assessments employed by the county assessor were appropriate and correct in light of the existing statutory and constitutional provisions set forth herein.

■ *W.Va.Code*, 11–1C–7(d) [1990] authorizes the tax commissioner to approve and a county assessor to adopt a valuation plan which "would permit the placement of proportionately uniform percentage changes in values on the books that estimate the percentage difference between the current as-

---

3. Because Maple Meadow's coal land is considered "natural resources property" within the Act, the tax commissioner is required to follow *W.Va. Code*, 11–1C–10 [1990] in valuing Maple Meadow's property for tax purposes. The valuation formula and process for natural resources property is set forth in subsection (d)(2) of this statute which provides, in part:

> Formulas for natural resources valuation may contain differing variables based upon known geological or other common factors. The tax commissioner shall forward each natural resources property appraisal to the county assessor of the county in which that property is located and the assessor shall multiply each such appraisal by sixty percent and include the resulting assessed value in the land book or the personal property book, as appropriate, for each tax year.

*W.Va.Code*, 11–1C–10(d)(2) [1990]. The tax commissioner, during the 1992 tax year, appraised Maple Meadow's natural resources property at $11,854,412. The assessed value of Maple Mead-

ow's natural resources property, for 1992, was $7,112,647.20, sixty percent of $11,854,412, the reappraised market value.

We reiterate that Maple Meadow is not challenging the tax commissioner's valuation of Maple Meadow's natural resources property, but rather Maple Meadow is contesting the assessment rate applied to the property. However, the majority of the increase in the assessed value is primarily due to the valuation of Maple Meadow's natural resources property and not in the assessment level of Maple Meadow's property. Pursuant to *W.Va.Code*, 11–1C–10(d)(2) [1990], the county assessor multiplies the tax commissioner's property appraisal by the assessment rate to arrive at the assessed value. When the sixty percent figure is multiplied by a larger valuation figure, obviously the assessed valuation figure will be larger. Thus, the assessed value of Maple Meadow's property increased due to the increase in the reappraised value of Maple Meadow's natural resources property.

sessed value and sixty percent of the fair market value for classes or identified subclasses of property and distribute the change between the two tax years preceding the tax year beginning on [July 1, 1993]." This method of valuation may be used in addition to or in lieu of placing individual values on the books at sixty percent of value. The goal of this provision is to ensure that all properties, whether it be properties revaluated by the county assessor, the board of public works or the state tax commissioner, reach the standard assessment rate of sixty percent of the fair market value by July 1, 1993, pursuant to *W.Va.Code*, 11–1C–1(d) [1990].

■ As stated earlier in the text, the county assessor's plan provided for all real property assessments to be phased in at forty percent for 1992, and fifty percent for 1993, in order to reach sixty percent by July 1, 1993. In 1992, the assessed valuation of other classes of real property was increased by 24.61% for 1992, in order to achieve the forty percent assessment value for the 1992 tax year. In other words, the county assessor was implementing what *W.Va.Code*, 11–1C–7(d) [1990] refers to as "proportionately uniform percentage changes in values" so as to eventually arrive at the mandated sixty percent assessment rate by July 1, 1993.

The county assessor testified before the circuit court that the county's oil, gas and other minerals were from the outset assessed at the statutory and constitutional goal of sixty percent, and so it was not necessary to adjust the assessment ratio on the natural resources properties. *W.Va.Code*, 11–1C–10(d)(2) [1990] specifically addresses natural resources property and states that natural resources property shall be multiplied by sixty percent to arrive at the assessed value of this species of property. *See* n. 2, *supra*.

*W.Va.Code*, 11–1C–7(d) and 11–1C–10(d)(2) [1990] are conspicuously striving to achieve what our state's Constitution mandates and that is for all real property to be assessed at a rate of sixty percent. In order to achieve this goal, the county assessor was required to raise the assessed value of those other classes of real property not placed at sixty percent of the fair market value from the outset of the implementation of the Act. *W.Va.Code*, 11–1C–7(d) [1990].

This is not an arbitrarily unequal assessment or a negation of the system pronounced in *W.Va.Code*, 11–1C–1(c) [1990]. The nature of the Act is to achieve equality among assessed valuation of all properties within the state. Unfortunately, in order for the state to realize this goal, inequalities will continue to exist within the system until total equality and uniformity can be attained. We, therefore, are of the opinion that Maple Meadow has failed to demonstrate by clear and convincing evidence that the tax assessment and the assessment valuation process employed by the county assessor is erroneous and in violation of *W.Va.Code*, 11–1C–7(d) [1990]. *See In re Tax Assessments Against Pocahontas Land Co.*, 172 W.Va. 53, 61, 303 S.E.2d 691, 699 (1983) ("It is obvious that where a taxpayer protests his assessment before a board, he bears the burden of demonstrating by clear and convincing evidence that his assessment is erroneous."); *accord* syl. pt. 2, in part, *Western Pocahontas Properties, Ltd., supra* ("The burden is on the taxpayer challenging the assessment to demonstrate by clear and convincing evidence that the tax assessment is erroneous.")

### III

This leads us to Maple Meadow's next point of contention which is that such selective unequal assessment of property, assessing natural resources property at sixty percent of fair market value while other classes of property are assessed at forty percent of fair market value, violates art. X, § 1 of the *West Virginia Constitution* and amendment XIV, § 1 of the *United States Constitution*. Article X, section 1 of the *West Virginia Constitution* provides, in relevant part:

Subject to the exceptions in this section contained, taxation shall be equal and uniform throughout the State, and all property, both real and personal, shall be taxed in proportion to its value to be ascertained as

526

directed by law. No one species of property from which a tax may be collected shall be taxed higher than any other species of property of equal value[.]

Amendment XIV, section 1 of the *United States Constitution* provides, in pertinent part, that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws."

Maple Meadow argues this Court's prior recognizance and prohibition of taxing any one species of property higher than any other species of property of equal value. In syllabus point 3 of *In re Tax Assessments Against Pocahontas Land Corporation,* 158 W.Va. 229, 210 S.E.2d 641 (1974), we held:

A systematic plan of assessing property whereby some property owners' assessments were increased 20% and other property owners in the same class were intentionally omitted from such increase is in violation of the equal and uniform taxation provision of Article X, Section 1 of the Constitution of West Virginia.

Maple Meadow further argues the case of *Allegheny Pittsburgh Coal Company v. County Commission of Webster County,* 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989) in which the United States Supreme Court reversed this Court's decision in *In re 1975 Tax Assessments Against Oneida Coal Co.,* 178 W.Va. 485, 360 S.E.2d 560 (1987).

*Oneida* involved four coal companies which contested the procedure used by the Webster County Assessor to determine property valuation for tax purposes. In *Oneida,* the assessment rate for property within Webster County was fixed at fifty percent as determined by the county assessor. The county assessor, however, fixed the appraised value at the consideration at which the property was sold. This approach resulted in dramatic differences in the valuation of each of the four coal companies' properties. This Court held the actions of the county assessor did not constitute "intentional and systematic" discrimination. *Id.* at 489, 360 S.E.2d at 564. We implied that the coal companies' assess-

ments need not be reduced but rather, " 'they should seek to have the assessments of other taxpayers raised to market value.' " *Id.* at 490, 360 S.E.2d at 565, *quoting Killen v. Logan County Commission,* 170 W.Va. 602, 622, 295 S.E.2d 689, 709 (1982) (citation omitted).

The United States Supreme Court reversed this Court's decision and found that the coal companies', and petitioners' therein, assessments were determined to be in excess of other property owners similarly situated and the petitioners were entitled to have their assessments lowered accordingly. The United States Supreme Court, in arriving at its conclusion, held that a system of taxation which intentionally and systematically results in gross disparities in the assessed value of the taxpayer's property in comparison to the assessed value of other comparable property denied the petitioners equal protection of the laws as guaranteed by the Constitution. The court went on to state, however, that "the present action is not an example of transitional delay in adjustment of assessed value resulting in inequalities in assessments of comparable property." *Allegheny Pittsburgh Coal Company,* 488 U.S. at 344, 109 S.Ct. at 638, 102 L.Ed.2d at 697. The court recognized that:

The use of a general adjustment as a transitional substitute for an individual reappraisal violates no constitutional command. As long as general adjustments are accurate enough over a short period of time to equalize the differences in proportion between the assessments of a class of property holders, the Equal Protection Clause is satisfied.

*Id.* at 343, 109 S.Ct. at 638, 102 L.Ed.2d at 697.

Similarly, this Court recognized a similar standard in an earlier decision: "[I]t is true that unintentional, sporadic deviations from an established system are not a sufficient basis for reversal of an assessment[.]" *In re U.S. Steel Corp.,* 165 W.Va. 373, 378, 268 S.E.2d 128, 132 (1980) (citation omitted).

The tax commissioner and county assessor contend, and we agree, that the

assessment valuation process in Raleigh County does not impinge upon Maple Meadow's right to equal and uniform taxation under the laws of this state. The general adjustments and any transitional inequalities that may result will only last three years. The Act will rectify inequity and the duration of any disparity is short. The corollary to all of this is equality.[4]

Therefore, we are of the opinion that a taxpayer's right to equal and uniform taxation under article X, section 1 of the *West Virginia Constitution* and equal protection of the laws under amendment XIV, section 1 of the *United States Constitution* is not violated when a certain class of property of that taxpayer is assessed at a higher percentage than certain other classes of property of other taxpayers within the three-year period of achieving equality of assessed property valuation pursuant to *W.Va.Code,* 11–1C–1, *et seq.* Accordingly, article X, section 1 of the *West Virginia Constitution* and amendment XIV, section 1 of the *United States Constitution* is satisfied when general adjustments are utilized over a short period of time to equalize the differences existing among taxpayers regarding property valuation and assessments.

### IV

■ We are of the opinion that no statutory or constitutional violation exists as contended by Maple Meadow. The record in this case clearly supports the circuit court's ruling regarding the Raleigh County Assessor's method of and conclusions in arriving at the assessments for the real property of the taxpayers of Raleigh County. We have previously held that:

'An assessment made by a board of review and equalization and approved by the circuit court will not be reversed when supported by substantial evidence unless plainly wrong.' Syl. pt. 1, *West Penn Pow-*

er Co. v. Board of Review and Equalization, 112 W.Va. 442, 164 S.E. 862 (1932). Syl. pt. 3, *Western Pocahontas Properties, Ltd. v. County Commission of Wetzel County,* 189 W.Va. 322, 431 S.E.2d 661 (1993). Upon review of the record, we conclude that the ruling of the circuit court should be affirmed.

Affirmed.

NEELY, J., dissents and reserves the right to file a dissenting opinion.

NEELY, Justice, dissenting:

The majority opinion summarizes the issue in this case as follows:

In this case, Maple Meadow begins by contending that the 1992 assessment of its natural resources property is in violation of *W.Va.Code,* 11–1C–7(d) [1990] and the Raleigh County valuation plan. Maple Meadow asserts that this section gives the county assessor the option of either placing changes in property value on the property books at sixty percent of value or phasing in any increases in value as discovered as a result of the reappraisal of the three-year reappraisal period; further, if the county assessor chooses the phase-in option, the county assessor must also phase in any increases in the property that the tax commissioner is responsible for appraising in "like manner." Maple Meadow argues, that because the county assessor elected to use the phase-in option on all other real property within the county, the county assessor must also assess Maple Meadow's natural resources property in the same manner. Thus, Maple Meadow asks that the county assessor be required to follow the county's valuation plan in compliance with *W.Va.Code,* 11–1C–7(d) [1990] so that Maple Meadow is treated the same as all other Raleigh County real property owners.

Maple Meadow is obviously right.

To the extent that there is authentic jurisprudential content to the equal protection

---

**4.** We reiterate the legislature's anticipation of possible inequalities that could arise as found in *W.Va.Code,* 11–1C–1(c) [1990], which specifically states, in relevant part: "The Legislature finds that requiring the valuation of property to occur in three-year cycles with an annual adjustment of assessments as to those properties for which a change in value is discovered shall not violate the equal and uniform provision of section one, article ten of the West Virginia Constitution[.]"

clause of *U.S. Constitution,* amend. XIV (as opposed to result-oriented politics, which is what we usually get in law) and its state counterparts, particularly *W.Va. Const.,* Art. 10, § 1, that content is the proposition that minorities are best protected when majorities are prohibited from singling them out for special, unfavorable legal treatment. In this case, big non-voting mineral-owning corporations were singled out for a good beating: to-wit, their assessments were raised immediately while local *voting residents* had the three-year grace period over which their assessments slowly rose. If ever there were an isolated, insular minority, it has to be persons of property who, at least theoretically, deserve as much constitutional protection as blacks, women, persons with disabilities, native Americans, Eskimos, and opponents of West Virginia University football. Furthermore, *W.Va. Const.,* Art. 10, § 1 says: "... taxation shall be equal and uniform throughout the State, and all property, both real and personal, shall be taxed in proportion to its value ..." *In re: U.S. Steel Corp.,* 165 W.Va. 373, 268 S.E.2d 128 (1980).

Maple Meadow and other mineral owners were singled out because they have lots of money and no votes. Nonetheless, it is entities like Maple Meadow that provide the jobs that are so scarce in West Virginia and on which West Virginia depends. That, unfortunately, is always the way it is with the rich—they actually do something useful—which is why we have restrained ourselves from lining them up against the wall and mowing them down with machine guns. Third World countries haven't completely figured all of this out, which is why residents of Third World countries frequently resort to eating one another *faute de mieux.*

Inconvenient as equal protection may be at times, it is a rubric under which golden-egg-laying geese are protected from wholesale slaughter. Therefore, I dissent.