CSX TRANSPORTATION, INC. and
Nicholas, Fayette and Greenbrier
Railroad Company, Plaintiffs,

v.

BOARD OF PUBLIC WORKS OF the
STATE OF WEST VIRGINIA,
Defendant.

Civ. A. No. 2:93–0695.

United States District Court,
S.D. West Virginia,
Charleston Division.

Jan. 9, 1995.

John R. Fowler, Huddleston, Bolen, Beatty, Porter & Copen, Charleston, WV, Anne M. Stolee, James W. McBride, Baker, Donelson, Bearman & Caldwell, Washington, DC, for plaintiff.

Katherine A. Schultz and Barry L. Koerber, Asst. Attys. Gen., Charleston, WV, for defendant.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

On November 8, 1994 this matter came on for trial before the Court sitting without a jury. Following the presentation of evidence by the parties, the Court took the matter under advisement, and Ordered the parties to submit post-trial briefs. The parties have complied and this matter is ripe for adjudication.

### I.

The plaintiffs, railroad companies owning property in West Virginia, brought this action pursuant to Title 49 U.S.C. § 11503

(1978) ("Section 306" of the Railroad Revitalization and Regulatory Reform Act of 1976). Section 306 prohibits States from assessing taxes on rail transportation property at a ratio higher than five percent above the ratio of assessed value to true market value than the State assesses taxes on other commercial and industrial property. The Defendant, Board of Public Works of the State of West Virginia ("the Board"), has assessed taxes on the plaintiffs for the tax year 1993. Plaintiffs contend the taxes assessed to them violate Section 306. Section 306 states, in pertinent part:

"(b) The following acts unreasonably burden and discriminate against interstate commerce, and a State, subdivision of a State, or authority acting for a State or subdivision of a State may not do any of them:

"(1) assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.

"(2) levy or collect a tax on an assessment that may not be made under clause (1) of this subsection.

"(3) levy or collect an ad valorem tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.

"(c) ... Relief may be granted ... only if the ratio of assessed value to true market value of rail transportation property exceeds by at least 5 percent, the ratio of assessed value to true market value of other commercial and industrial property in the same assessment jurisdiction."

The parties agree the Board assessed the rail transportation property of plaintiff CSX Transportation, Inc. at a ratio of 50 percent of true market value, and assessed the property of plaintiff Nicholas, Fayette and Greenbrier Railroad Company at a ratio of 56.125 percent of true market value. The parties point of disagreement concerns the ratio of assessed value to true market value of all other commercial and industrial property in West Virginia. Both parties presented expert testimony in support of their respective positions: plaintiffs contend the ratio of assessed value to true market value of the other commercial and industrial property was 37.18 percent, thus causing a violation of Section 306 because that ratio is more than 5 percent lower than the ratio of assessed to true market value of the plaintiffs rail transportation property; the Board argues other commercial and industrial property was assessed at a ratio of 54.8 percent of assessed to true market value, well within the 5 percent boundary mandated in Section 306. The question for the Court is a simple one on its face: Which ratio of assessed to true market value of commercial and industrial property should be applied for the purposes of Section 306? If the ratio advocated by the Board is lawful, its tax assessment must be affirmed; but if the ratio propounded by the plaintiffs is the appropriate one, the tax assessment must be reduced.

II.

Under Section 306, "[t]he burden of proof in determining assessed value and true market value is determined by State law." Thus, the Court applies the burden of proof imposed by the State of West Virginia when it determines proper assessed and true market values of taxable property. It is clear in West Virginia the burden of proving an erroneous tax assessment falls upon the taxpayer: "The burden of showing an assessment to be erroneous is, of course, upon the taxpayer[.]" *Syllabus* Point 1, in part, *Petition of Maple Meadow Mining Co. for Relief from Real Property Assessment for Tax Year 1992,* 191 W.Va. 519, 446 S.E.2d 912 (1994). *Accord, Syllabus* Point 1, *Western Pocahontas Properties, Ltd. v. County Com'n of Wetzel County,* 189 W.Va. 322, 431 S.E.2d 661 (1993); *Syllabus* Point 1, *Eastern American Energy Corp. v. Thorn,* 189 W.Va. 75, 428 S.E.2d 56 (1993) (*per curiam*); *Syllabus* Point 7, *In re Tax Assessments Against Pocahontas Land Co.,* 172 W.Va. 53, 303 S.E.2d 691 (1983); *Syllabus* Point 7, *Killen v. Logan County Com'n,* 170 W.Va. 602, 295 S.E.2d

689 (1982); *In re Tax Assessments Against the Southern Land Co.,* 143 W.Va. 152, 163, 100 S.E.2d 555, 561 (1957) ("[T]here is a presumption in favor of the validity of tax assessments regularly made, and ... the burden is on those who seek to show that the valuation upon which a tax liability is asserted is erroneous."), *citing Bankers Pocahontas Coal Co. v. County Court of McDowell County,* 135 W.Va. 174, 62 S.E.2d 801 (1950) and *Norfolk & W. Ry. Co. v. Board of Public Works,* 124 W.Va. 562, 21 S.E.2d 143 (1942). The parties contested, however, what measure or standard of proof is to be used to gauge when the burden of proving an erroneous assessment is met.

In a relatively early decision bearing on the burden of proof standard, the Supreme Court of Appeals of West Virginia adopted a deferential approach to the assessment values determined by the assessing officer, and determined the assessment should be upheld where supported by "substantial evidence." *Syllabus* Point 2 of *In re Tax Assessments Against the Southern Land Company, supra,* holds:

> "In a case involving the assessment of property for taxation purposes, which does not involve the violation of a statute governing the assessment of property, or a violation of a constitutional provision, or in which the question of the constitutionality of a statute is not involved, this Court will not set aside or disturb an assessment made by an assessor or the county court, acting as a board of equalization and review, where the assessment is supported by substantial evidence." [1]

Thus, under *Southern Land, supra,* the burden falls upon the challenger of an assessment to show the assessment is not supported by substantial evidence.

More recently, the Supreme Court of Appeals of West Virginia has relied upon two different standards for proving erroneous assessments. In *Syllabus* Point 8, *Killen v. Logan County Commission, supra,* the Court adopted a "preponderance of the evidence" standard, stating:

> "An objection to any assessment may be sustained only upon the presentation of competent evidence, such as that equivalent to testimony of qualified appraisers, that the property has been under- or overvalued by the tax commissioner and wrongly assessed by the assessor. The objecting party, whether it be the taxpayer, the tax commissioner or another third party, must show by a preponderance of the evidence that the assessment is incorrect."

In footnote 27 of *Killen,* Justice McGraw distinguished the "substantial evidence" standard articulated in *Southern Land, supra,* as applying only to *appellate* review after an initial determination on the challenger's objection. It is unclear what authority Justice McGraw utilized to distinguish *Southern Land* or upon what basis he articulated the "preponderance of the evidence" standard stated therein. Nonetheless, the "preponderance of the evidence" standard was followed in a recent *per curiam* decision. *Syllabus* Point 3, *Eastern American Energy Corp. v. Thorn, supra.*

On the other hand, a separate line of cases has held the challenging party to a higher standard, holding the challenger must prove error by "clear and convincing evidence." In an opinion authored by Justice Miller, *In re Tax Assessments Against Pocahontas Land Co., supra,* 172 W.Va. at 61, 303 S.E.2d at 699, the Court stated: "It is obvious that where a taxpayer protests his assessment before a board, he bears the burden of demonstrating by clear and convincing evidence that his assessment is erroneous." [2] As au-

---

1. In the text of the decision the Court went further and stated:

    "The ascertainment of the value of property for purposes of taxation is primarily an executive or administrative function with which the courts will not and cannot interfere, unless the assessment upon which the proposed taxation is based is without substantial evidence to support it, or is in violation of the due process clause of the West Virginia Constitution, Arti-

cle III, Section 10, or in violation of the equal protection clause of the Fourteenth Amendment to the Constitution of the United States."

2. In *Syllabus* Point 7 of *In re Pocahontas Land Co., supra,* the Court held: "It is a general rule that valuations for taxation purposes fixed by an assessing officer are presumed to be correct. The burden of showing an assessment to be erro-

thority for the "clear and convincing evidence" standard articulated in *In re Tax Assessments Against Pocahontas Land Co.*, *supra,* the Court cited *In re: National Bank of West Virginia at Wheeling,* 137 W.Va. 673, 687, 73 S.E.2d 655, 644 (1952), *overruled on other grounds, In re Assessment of Kanawha Valley Bank,* 144 W.Va. 346, 109 S.E.2d 649 (1959). Significantly, *In re: National Bank of West Virginia at Wheeling, supra,* cites a long history of cases in support of the higher standard of proof: *People of State of New York ex rel Amoskeag Sav. Bank of Manchester, N.H. v. Purdy,* 231 U.S. 373, 34 S.Ct. 114, 58 L.Ed. 274 (1913); *Bankers Pocahontas Coal Co. v. Federal Savings & Loan Ass'n,* 135 W.Va. 174, 62 S.E.2d 801 (1950); *In re Charleston Federal Savings & Loan Ass'n,* 126 W.Va. 506, 30 S.E.2d 513 (1944), *aff'd, Charleston Federal Savings & Loan Ass'n v. Alderson,* 324 U.S. 182, 65 S.Ct. 624, 89 L.Ed. 857 (1945); *West Penn Power Co. v. Board of Review and Equalization of Brooke County,* 112 W.Va. 442, 164 S.E. 862 (1932). *See also Central Realty Co. v. Board of Equalization & Review of Cabell County,* 110 W.Va. 437, 158 S.E. 537 (1931).

Perhaps most significantly, however, the "clear and convincing evidence" standard has been followed in the two most recent decisions of the Supreme Court of Appeals of West Virginia specifying the standard of proof in tax assessment challenges, both authored by Justice McHugh: *In re Maple Meadow Mining Co.,* 191 W.Va. at 523, 446 S.E.2d at 916 ("The burden clearly falls upon [the challenging party] to demonstrate through clear and convincing evidence that the tax assessments were erroneous.") and *Syllabus* Point 2, in part, *Western Pocahontas Properties, Ltd. v. County Commission of Wetzel County, supra* ("The burden is on the taxpayer challenging the assessment to demonstrate by clear and convincing evidence that the tax assessment is erroneous.").

■ The Court concludes West Virginia presently utilizes a burden of proof standard of "clear and convincing evidence." Although there is authority to the contrary, the "clear and convincing evidence" standard has

a long history in West Virginia tax assessment challenges and has also been applied in the most recent cases. Nonetheless, as will be shown below, the Court's decision in this case would be the same under either burden of proof standard.

## III.

■ Subsection (c) of Section 306 suggests the ratio of the assessed value to the true market value of commercial and industrial property in the assessment jurisdiction "be determined [if possible] to the satisfaction of the district court through the random-sampling method known as a sales assessment ratio study (to be carried out under statistical principles applicable to such a study)[.]" The parties disagree on the appropriate "sales assessment ratio study" to be used to determine the ratio of assessed to true market value of commercial and industrial property. The dispute centers on whether the ratio determined by the Defendant was distorted by the inclusion of what is termed "sales chasing." Sales chasing occurs when an assessor changes the value of an assessment in response to a sale, but does not change the assessed values of properties that do not sell. Plaintiffs argue Defendant's calculations are tainted by sales chasing and that the appropriate level of measurement is the median of the ratios of assessed to true market value of commercial and industrial property. Defendant contends its calculations were not influenced by sales chasing when it determined the ratio of assessed to true market value of commercial and industrial property by utilizing a "ratio of aggregates" test (otherwise known as the "weighted mean").

### A.

In *Southern Railway Co. v. State Board of Equalization,* 712 F.Supp. 1557, 1569 (N.D.Ga.1988), the court was faced with choosing between the two competing statistical measurements also at issue in this case. That court cogently and concisely described the two measurements as follows:

neous is, of course, upon the taxpayer, and proof

of such fact must be clear."

"There are two types of averages which statisticians agree can be used to determine the level of assessment of real property from sales assessment ratio study data. These two averages are the median and the ratio of aggregates. To calculate the median, the statistician converts each sample to a percentage of assessed value to selling price. For example, if a parcel of property in the statistical sample is assessed at $10,000.00 and sells for $40,000.00, the ratio applicable to that parcel is 25% ($10,000 divided by $40,000 × 100). The individual ratios contained in the sample are arrayed in descending order to find the median, which is the ratio in the middle. When the median is used as the average, 50% of the ratios in the sample fall above the median and 50% of the ratios in the sample fall below the median.

"The ratio of aggregates, as the name applies, is an aggregate calculation. All assessments in the edited data base are summed. All selling prices are summed. The sum of the assessments is divided by the sum of the selling prices. The result is then converted to a percentage (assessed values divided by selling prices × 100)."

Curiously, the instant plaintiffs' lone witness and expert, Dr. Frederick A. Ekeblad successfully testified in *Southern Railway Co., supra,* that the "ratio of aggregates" was "the only average which should be used to estimate market value of real property under the facts of [that] case." 712 F.Supp. at 1569. In the instant case, by contrast, Dr. Ekeblad testified the "ratio of aggregates" utilized by the Defendant was not appropriate, and the median calculation should be used.[3]

### B.

Plaintiffs rely heavily upon the decision of the Court of Appeals in *Clinchfield Railroad Company v. Lynch,* 700 F.2d 126 (4th Cir. 1983). In footnote 5, the Court stated:

"We are unpersuaded ... by the state's argument in support of the weighted average method. While there are isolated references in the legislative annals that suggest the appropriateness of a weighted average method ... it cannot be gainsaid that Congress clearly intended that railroads should be treated comparably to all other commercial and industrial taxpayers—and not merely to all other public service company taxpayers. The latter would tend to be the consequence if a weighted average is used; discriminatory treatment of other large taxpayers would skew an arithmetical average. Perhaps that explains why, as the testimony below revealed, the standard practice in the field of sales-assessment ratio studies is to employ the median method.

"Bearing in mind the remedial purposes of § 306 and the overriding concern of Congress for a method that 'make[s] possible the fairest comparison—that of the carrier with the hypothetical "average" taxpayer,' ... we believe the district court chose the correct method [when it utilized the median assessment ratio rather than the weighted average measure]." (citations omitted). 700 F.2d at 130, n. 5.

Apparently, the Court of Appeals utilized Dr. Ekeblad's testimony to reach its conclusion that, "the standard practice in the field of sales-assessment ratio studies is to employ the median method." *See Clinchfield Railroad Company v. Lynch,* 527 F.Supp. 784, 789 (E.D.N.C.1981), *aff'd,* 700 F.2d 126 (4th Cir.1983). The Court's reliance thereon appears awkward, however, when contrasted with Dr. Ekeblad's testimony several years later in *Southern Railway Co., supra,* 712 F.Supp. at 1569, where his testimony was described by the Court as follows: "Dr. Ekeblad testified that he did not know of any-

---

3. Dr. Ekeblad's testimony in the instant case is characterized by plaintiffs' counsel as follows: "the median is subject to less distortion by properties having extremely high or extremely low ratios, while the weighted mean is subject to much more distortion caused by sales involving a very high dollar amount." Plaintiffs' post-trial brief at 13. This is directly contrary to Dr. Ekeblad's prior testimony in *Southern Railway*

*Co., supra,* 712 F.Supp. at 1569, where the Court described his testimony as follows: "The defendants' expert witness ... testified that the median should be used to estimate the market value of real property because it is the middle of the ratio and is not influenced by extremes to the same extent that the ratio of aggregates is influenced by extremes. The Railroads' expert, Dr. Ekeblad, disagreed."

one qualified as an expert in the field of sales assessment ratio studies other than [opposing expert] Dr. Manson who used the median to estimate the value of real property." From the foregoing, it appears Dr. Ekeblad's credibility, and whether the Court of Appeals would continue to rely upon it, is open to question because Dr. Ekeblad's testimony on this topic in prior legal proceedings appears inexcusably inconsistent.

Moreover, it is not at all clear the Court of Appeals intended to mandate the use of the median as opposed to a ratio of aggregates in every instance. Although our Circuit Court has not had occasion to revisit *Clinchfield, supra,* the Ninth Circuit has observed: "Neither the district court memorandum nor the Fourth Circuit opinion affirming . . . indicated the 'median' approach is the only one that will comply with § 11503. *Clinchfield R. Co. v. Lynch,* 700 F.2d 126." *ACF Industries, Inc. v. State of Arizona,* 714 F.2d 93, 95 (9th Cir.1983). The Ninth Circuit cited the legislative history of Section 306 as support for the "weighted average" measurement as opposed to the "median" measurement. *See* footnote 4, *infra.*

For the reasons cited above, the Court concludes the Court of Appeals decision in *Clinchfield, supra,* does not mandate use of a "median" measurement under Section 306.

### C.

Although the plaintiffs argue a median measurement should be employed to determine the actual sales assessment ratio, both parties utilized weighing factors in reaching their conclusions. Plaintiffs' expert Dr. Ekeblad weighted the sales data provided by

the Defendant to take into account differences in sales assessment ratios in terms of both vacant and improved properties, and by county. It is unclear why those weighing concepts, and not others, were utilized: although plaintiffs assert authority in support of weighing in terms of *urban* versus *rural* property may be appropriate in certain circumstances, *see People ex rel. Kohorst v. Gulf, Mobile and Ohio R.R. Co.,* 22 Ill.2d 104, 110, n. 4, 174 N.E.2d 182, 186, n. 4 (1961), they present no authority advocating or opposing weighing by *vacant* versus *improved* property or by the number of. parcels per county.[4]

### D.

Dr. Ekeblad attempted to show the Defendant's assessment was tainted by sales chasing by analyzing two six month periods of assessments. Dr. Ekeblad calculated a median level of 48.8 percent for the first six months of 1992 and a median of 41.9 percent. From those calculations, Dr. Ekeblad concluded "sales chasing" occurred in part of 1992, and thus the Defendant's calculations were tainted. The Court is not persuaded Dr. Ekeblad's conclusions are well-founded. The Defendant presented testimony to the effect that similar variations occurred in the 1991 tax-year, a period plaintiffs agree was *not* tainted by sales chasing. Moreover, the Defendant's expert, Mr. Robert Denne, calculated a median of 43.3 percent for the first half of 1992 and a second half median of 44.5 percent, calculations that dispute the sales chasing argument.

Defendant's expert Mr. Denne performed a study indicating no sales chasing occurred.

---

**4.** Plaintiffs argument for weighing by improved versus vacant parcels is to the effect that vacant parcels were under-represented in the sales included in Defendant's study. Because the plaintiffs agreed to utilize the same underlying data used in Defendant's study, Dr. Ekeblad factored up the number of vacant parcels to reach the level of vacant parcels statewide.

Likewise, Dr. Ekeblad weighted his ratio study by county so that the sales in the Defendant's study would conform with the number of like properties in each county represented on the tax roll as a whole.

It is unclear why Dr. Ekeblad chose to weight the properties in the sample by county or by

improvement status, rather than by some other factor. The only reason given for weighing the sample in those respects is the 1961 Illinois state court decision in *Kohorst, supra,* and the legislative history of Section 306, *see* S.Rep. No. 1483, 90th Cong., 2nd Sess., Appendix C (1968) ("From the eligible transactions comprising the sample various ratios are computed, with consideration being given to both urban and rural property, and a weighted ratio is determined and expressed in terms of an assessment ratio[.]") discussing weighing in regard to rural versus urban properties. Dr. Ekeblad did not weight his ratio assessment study by rural versus urban property.

He performed what is known as a "Mann–Whitney" test. The test is designed to determine the difference in change in level of assessment of sold properties with the level assessment of unsold properties.[5] Mr. Denne testified his Mann–Whitney test actually showed greater increase in the assessment of *unsold* properties than in *sold* properties.[6] Obviously, the results of the Mann–Whitney test dispute the argument sales chasing occurred because the assessment of unsold properties rose at a greater percentage than sold properties.

All testimony considered, the Court concludes plaintiffs have not proven clearly and convincingly, or even by a preponderance of the evidence, that Defendant's assessment calculations were tainted by sales chasing.

## IV.

The Court notes that challenges to tax assessments under Section 306 have been made frequently in this jurisdiction, and the Court is impressed with the Defendant's improving efforts to comply with the anti-discrimination provisions of Section 306. The Court also concludes the testimony of Defendant's expert Mr. Denne was more credible than the testimony of Plaintiff's expert, Dr. Ekeblad. Dr. Ekeblad testified in *Southern Railway Co., supra,* that the appropriate statistical measurement in these type of cases was the ratio of aggregates, and that he knew of only one person who utilized the median. In the instant case he advocates use of the median. No one has suggested Defendant's expert has provided similar result-oriented opinions in other litigation. Accordingly, the Court accepts Mr. Denne's testimony as more credible than Dr. Ekeblad's.

The Court thus concludes the evidence establishes the level of assessment of non-railroad commercial and industrial property in West Virginia for the 1993 tax year was appropriately calculated at 54.8 percent. The level of assessment of plaintiffs property did not exceed 5 percent more than other commercial and industrial property in the State. Plaintiffs have not overcome their burden of proving, under either standard of proof, the Defendant's tax assessment illegally discriminated against them under Section 306.

## V.

Based upon the foregoing, the Court **ORDERS** judgment in favor of the Defendant.

---

**5.** Dr. Ekeblad did not examine the assessment of unsold properties. Thus it is difficult for plaintiffs to argue the assessments of sold properties reflect sales chasing because they did not analyze whether assessments of unsold properties rose in concert with the assessments of sold properties.

**6.** Dr. Ekeblad and plaintiffs argued the Mann–Whitney test should be rejected because Mr. Denne utilized a 95 percent "confidence level" to determine the validity of his study. Mr. Denne testified the 95 percent confidence level is commonly accepted among those performing ratio assessment studies. Defendant contends, "The 95% confidence level is ... commonly used in the field of statistics, [and] is also recommended by [the International Association of Assessing Officers] in connection with assessment ratio studies." Defendant's post-trial brief at 11. The Court credits Mr. Denne's testimony on this point, and finds the 95 percent confidence level appropriate for the Mann–Whitney test used in this case.