Filed:  October 8, 1996

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 95-1244
(CA-93-695-2)

CSX Transportation, etc., et al,

                              Plaintiffs - Appellants,

        versus

The Board of Public Works of the State of West
Virginia,

                              Defendant - Appellee.

O R D E R

        The Court amends its opinion filed September 10, 1996, as
follows:

        On the cover sheet, section 6, lines 2-3 -- the sentence is
corrected to read "Judge Niemeyer wrote the opinion, in which Judge
Murnaghan and Judge <u>Williams</u> joined."

                              For the Court - By Direction

                              /s/ Patricia S. Connor
                              _____
                                          Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CSX TRANSPORTATION,
INCORPORATED; NICHOLAS, FAYETTE
AND GREENBRIER RAILROAD COMPANY,
Plaintiffs-Appellants,

                                       No. 95-1244

v.

THE BOARD OF PUBLIC WORKS OF THE
STATE OF WEST VIRGINIA,
Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
Charles H. Haden II, Chief District Judge.
(CA-93-695-2)

Argued: May 8, 1996

Decided: September 10, 1996

Before MURNAGHAN, NIEMEYER, and WILLIAMS,
Circuit Judges.

_____

Affirmed in part, reversed in part, and remanded by published opinion. Judge Niemeyer wrote the opinion, in which Judge Murnaghan and Judge Williams joined.

_____

**COUNSEL**

**ARGUED:** James W. McBride, BAKER, DONELSON, BEARMAN
& CALDWELL, Washington, D.C., for Appellants. Katherine A.

Schultz, Senior Deputy Attorney General, OFFICE OF THE ATTOR-
NEY GENERAL, Charleston, West Virginia, for Appellee. **ON
BRIEF:** Anne M. Stolee, BAKER, DONELSON, BEARMAN &
CALDWELL, Washington, D.C., for Appellants. Darrell V. Mc-
Graw, Jr., Attorney General, Silas B. Taylor, Managing Deputy
Attorney General, Barry L. Koerber, Assistant Attorney General,
OFFICE OF THE ATTORNEY GENERAL, Charleston, West Vir-
ginia, for Appellee.

_____

## OPINION

NIEMEYER, Circuit Judge:

Section 306 of the Railroad Revitalization and Regulatory Reform
Act of 1976 (the "Railroad Revitalization Act" or the "Act"), 49
U.S.C. § 11503,* prohibits states from levying or collecting taxes on
rail transportation property that discriminate against that property.
The Act declares such taxation an undue burden on interstate com-
merce.

CSX Transportation, Inc. ("CSX") and Nicholas, Fayette & Green-
brier Railroad Company ("NF&G") (collectively, the "Railroads")
brought this action to enjoin the State of West Virginia from levying
and collecting its ad valorem tax for 1993. The Railroads alleged that
the assessed value to true market value ratio that West Virginia had
used for taxing their property discriminated against them in violation
of the Railroad Revitalization Act. After a bench trial, the district
court rejected the Railroads' challenge. See CSX Transp., Inc. v.
Board of Pub. Works, 871 F. Supp. 897 (S.D.W.Va. 1995).

_____

* Section 306 was originally codified at 49 U.S.C. § 26c (1976), but
was recodified in 1978 at 49 U.S.C. § 11503. Revised Interstate Com-
merce Act, Pub. L. No. 95-473, 92 Stat. 1337 et seq. (1978). While slight
language changes accompanied the recodification, the recodified act pro-
vided that it "may not be construed as making a substantive change in
the laws replaced." Id. § 3(a), 92 Stat. 1466.

2

On appeal, the Railroads contend that the district court (1) errone-ously required them to prove discrimination by "clear and convinc-ing" evidence; (2) improperly discredited their expert testimony on the appropriate statistical method for demonstrating discrimination; (3) incorrectly applied the "ratio of aggregates" rather than the median ratio to measure the assessment level of West Virginia's other com-mercial and industrial property; and (4) clearly erred in finding that the State's data were not tainted by "sales chasing," the practice of increasing the assessments of properties that sell based on their sales prices without making similar adjustments for properties that do not sell.

While we affirm the district court's finding that "sales chasing" did not compromise the State's data, we agree with the Railroads on their remaining assignments of error. Accordingly, we reverse and remand for entry of a judgment requiring the State to assess the Railroads' property at the median assessment level of West Virginia's other commercial and industrial property.

I

In 1993, the State of West Virginia was in the second year of a three-year general reappraisal designed to raise all property assess-ments to 60% of true market value, the State's statutory level of assessment. To that end, the State conducted and published a Sales-Assessment Ratio Study for 1993 (the "1993 Study"), which tabulates property assessments and compares them to actual sales prices, thereby developing a ratio of assessed value to market value for each property. The 1993 Study reveals that the median ratio of assessed value to market value for commercial and industrial properties was 47.28%. The 1993 Study also shows that when the same properties' assessed values were totalled and that sum was then divided by the sum total of the properties' selling prices -- the computation that pro-duces the "ratio of aggregates" -- the assessed to market value ratio for commercial and industrial property was 54.80%

Relying on the "ratio of aggregates" as the best indicator of its assessment level, the State taxed CSX and NF&G for 1993 based on assessment ratios of 50% and 56.165%, respectively. Thus, CSX's assessment ratio was lower than the 54.80% ratio of aggregates for

3

other commercial and industrial property, and NF&G's assessment ratio, while higher, did not exceed the 5% variance permitted by the Railroad Revitalization Act. See 49 U.S.C. § 11503(c). If, however, the State had used the median ratio as the most representative indicator of its assessment level, the parties acknowledge that the Act would entitle both CSX and NF&G to relief.

Challenging the State's reliance on the "ratio of aggregates," the Railroads filed this action under § 306 of the Railroad Revitalization Act. While they elected not to conduct an independent sales assessment ratio study and accepted both the assessments and sales prices listed in West Virginia's 1993 Study, the Railroads argued that in determining their tax liability the State should have used the median assessed to market value ratio. They also contended that the State should have eliminated the distortion in the 1993 Study that had been created by its practice of "sales chasing," which treats sold properties differently than unsold properties. According to the Railroads, adjusting the data to eliminate the effect of sales chasing would yield an assessment equal to 37.18% of the properties' market value.

At trial, the Railroads offered testimony only from their expert witness, Dr. Frederick A. Ekeblad, who gave his opinion that the median ratio most accurately measures the State's level of assessing commercial and industrial property. The State offered the testimony of Barbara G. Brunner, a tax and revenue manager in the West Virginia Department of Tax and Revenue's Property Tax Division, who presented the State's 1993 Study. And it offered its own expert witness, Robert C. Denne, who defended the State's use of the ratio of aggregates.

The district court concluded that the Railroads had not met their burden of proving discriminatory taxation violative of the Railroad Revitalization Act and upheld West Virginia's taxation of the Railroads based on a 54.80% assessment ratio. 871 F. Supp. at 903. While the court imposed on the Railroads the burden of proving their case by clear and convincing evidence, it found that the Railroads had not satisfied even the lesser preponderance-of-the-evidence standard. Id. at 900. In explaining its decision to apply the ratio of aggregates rather than the median ratio, the court acknowledged the Fourth Circuit's earlier observation that "the standard practice in the field of

4

sales-assessment ratio studies is to employ the median method," Clinchfield R.R. v. Lynch, 700 F.2d 126, 130 n.5 (4th Cir. 1983), but dismissed that observation on the ground that Dr. Ekeblad, the expert on whom we had relied, had subsequently taken an inconsistent position and therefore was not credible. 871 F. Supp. at 901-02. Noting that in Southern Ry. Co. v. State Bd. of Equalization, 712 F. Supp. 1557, 1569 (N.D.Ga. 1988), Dr. Ekeblad is reported to have testified that "anyone qualified as an expert in the field of sales assessment ratio studies" uses the ratio of aggregates, the district court concluded:

> From the foregoing, it appears Dr. Ekeblad's credibility, and whether the Court of Appeals would continue to rely upon it, is open to question because Dr. Ekeblad's testimony on this topic in prior legal proceedings appears inexcusably inconsistent.

871 F. Supp. at 902.

From the district court's judgment, this appeal followed.

II

Congress enacted the Railroad Revitalization Act in 1976 to restore financial stability to this country's railroad system. See Burlington Northern R.R. v. Oklahoma Tax Comm'n, 481 U.S. 454, 457 (1987). Railroads had long been targets for state and local taxing authorities because their principal property was specialized and immobile, and it was difficult for them to escape heavy taxation by transferring assets. See Burlington Northern R.R. v. City of Superior, 932 F.2d 1185, 1186 (7th Cir. 1991). Indeed, Congress found that railroads were being "over-taxed" by at least $50 million annually. H.R. Rep. No. 725, 94th Cong., 2d Sess., at 78 (1975). Thus, to "lift from [the railroads'] backs some of the heavy hand of state and local taxation" by prohibiting discriminatory taxation of rail transportation property, Congress included § 306 in the Railroad Revitalization Act, Pub. L. No. 94-210, 90 Stat. 54 (1976). Burlington Northern, 932 F.2d at 1186; see also Clinchfield, 700 F.2d at 128-29 n.1; Ogilvie v. State Bd. of Equalization, 657 F.2d 204, 207 (8th Cir.), cert. denied, 454 U.S. 1086 (1981). Section 306 declares discriminatory state taxation of railroads "an unreasonable and unjust discrimination against, and

5

an undue burden on, interstate commerce." Pub. L. No. 94-210, § 306, 90 Stat. 54 (1976).

To prohibit discriminatory taxation, the Railroad Revitalization Act provides that a state may not

> assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.

49 U.S.C. § 11503(b)(1). Thus, the task of determining whether a state's taxation of railroad property is discriminatory begins by comparing the ratio of assessed value to market value for rail transportation property with the same ratio for other commercial and industrial property in the same taxing jurisdiction. If the ratio for rail transportation property exceeds the ratio for the other commercial and industrial property by at least 5%, the Act authorizes district courts to grant railroads relief. See 49 U.S.C. § 11503(c).

Because the assessment ratio for any given property is determined by dividing its assessed value by its true market value, finding a single ratio for all of a state's commercial and industrial property is simply an exercise in statistics. Not all properties sell in a given year, so the statistical sample that is generally available consists of the properties that do sell in that year. If a sample property sells for an unusually low price, the sale produces a larger assessed to market value ratio, and, conversely, if a sample property sells for an unusually high price, a lower ratio results. The statistical problem is to determine what single ratio best represents the overall sample of ratios.

Statistics experts recognize two basic methods for determining a single ratio that is representative of a sample of ratios: the ratio of aggregates and the median ratio. We have acknowledged that the standard practice in cases like the one before us is to use the median ratio, Clinchfield, 700 F.2d at 130 n.5, because the median ratio accords equal weight to each ratio in the sample without giving undue weight to aberrations. Where similar types of property subject to a

6

uniform criterion for assessment are involved, the ratio of aggregates might not represent the sample as accurately because it favors ratios derived from more expensive properties even though sales price should not be relevant to the proper assessment ratio.

Because a broad range of data and circumstances may properly be considered in a sales assessment ratio study, however, we cannot adopt a rule for determining the assessed to market value ratio in every case. But it is clear that Congress expected courts to determine states' assessment levels for other commercial and industrial property by applying sound statistical principles to random samples. See 49 U.S.C. § 11503(c).

III

As a threshold matter, the Railroads contend that the district court erred in requiring them to establish discrimination under the Railroad Revitalization Act by clear and convincing evidence, rather than by a preponderance of the evidence. Heeding the Act's direction that "[t]he burden of proof in determining assessed value and true market value [be] governed by State law," 49 U.S.C. § 11503(c), the district court applied the clear and convincing standard that West Virginia courts use to review state tax assessments. 871 F. Supp. at 900 (citing, e.g., In re Maple Meadow Mining Co., 446 S.E.2d 912, 916 (W.Va. 1994); Western Pocahontas Properties, Ltd. v. County Comm'n, 431 S.E.2d 661, 664 (W.Va. 1993)).

The Railroads contest the district court's analogy between actions under the Railroad Revitalization Act and appeals from administrative action, such as tax assessments. They argue that because this is a de novo suit brought in federal court to enforce a federal statutory right, the court should have applied the burden of proof that West Virginia courts apply in de novo civil proceedings. Moreover, the Railroads direct us to West Virginia authority that distinguishes between appeals from assessment determinations and de novo assessment proceedings:

> It is important to realize the difference in the burden of proof required in a de novo proceeding and the standard of judicial review utilized by courts when considering appeals

7

of assessments. W.Va. Code § 11-3-25 allows taxpayers to contest the proposed assessment value before the Board of Equalization and Review. The preponderance of the evidence standard would apply to that proceeding. Under certain circumstances, (e.g. lack of notice or lack of appearance before the Board of Equalization and Review), a taxpayer may secure a de novo proceeding in circuit court. In such a case, the preponderance standard would also apply. However, when the taxpayer has appeared before the Board of Equalization and Review, judicial review by the circuit court and by this Court will be limited.

Killen v. Logan County Comm'n, 295 S.E.2d 689, 706 n.27 (W.Va. 1982) (emphasis added); see also Eastern Am. Energy Corp. v. Thorn, 428 S.E.2d 56, 59-60 (W.Va 1993) (per curiam).

We agree with the Railroads that the distinction pertains here. This case does not involve review of an assessment by a state agency or other comparable body; it is an original action in which the parties have stipulated to the accuracy of the assessment and sales data. Accordingly, this case demands only the resolution of the parties' dispute over the appropriate statistical analysis of those data. Furthermore, as the court noted in Killen, West Virginia courts apply the preponderance of evidence standard even to taxpayers' initial challenges to their tax assessments. 295 S.E.2d at 706.

While we conclude that the district court erred in imposing the clear and convincing burden of proof on the Railroads, the court found that the Railroads had failed to prove discriminatory taxation even under the preponderance of evidence standard. Foremost in the court's explanation of that finding was its observation that the testimony of Dr. Ekeblad, the Railroads' expert witness, was inconsistent with his earlier testimony in Southern Ry. Co. v. State Bd. of Equalization, 712 F. Supp. 1557 (N.D.Ga. 1988), and, therefore, incredible. 871 F. Supp. at 902-03. Accordingly, we turn to the Railroads' contention that the district court improperly discredited Dr. Ekeblad.

IV

The Railroads note that courts have repeatedly recognized Dr. Ekeblad as an expert in the area of tax assessment ratios and that nothing

8

in the record before the district court, including the State's argument, impugned his expertise or credibility. Rather, the Railroads observe, the district court discredited Dr. Ekeblad <u>sua sponte</u> on the basis of a published decision from another district without requesting the benefit of argument from counsel, without reading Dr. Ekeblad's complete testimony from that case, and without confronting Dr. Ekeblad in this case with his prior testimony.

In its opinion, the district court compared Dr. Ekeblad's testimony in this case, which advocated use of the median ratio to determine the assessment ratio for industrial and commercial property in West Virginia, with his testimony reported in the <u>Southern Railway</u> case. Noting that Dr. Ekeblad's testimony "appears inexcusably inconsistent," the court not only concluded that his "credibility . . . is open to question," but also found our decision in <u>Clinchfield</u> open to question because of its reliance on Dr. Ekeblad's testimony. 871 F. Supp. at 902. Accordingly, the court rejected Dr. Ekeblad's testimony and our suggestion that in most cases the median ratio best represents the assessed to market value ratio for commercial and industrial property.

Because the district court discredited Dr. Ekeblad solely on the basis of the published report of his testimony in the <u>Southern Railway</u> case, we review the court's credibility determination <u>de novo</u>.

A careful reading of <u>Southern Railway</u> confirms the Railroads' contention that the portion of Dr. Ekeblad's testimony to which the <u>Southern Railway</u> court referred was addressing a materially different question than the one presented here. The district court in this case relied on the <u>Southern Railway</u> court's observation that "Dr. Ekeblad testified that he did not know of anyone qualified as an expert in the field of sales assessment ratio studies other than[opposing expert] Dr. Manson who used the median to estimate the value of real property." 871 F. Supp. at 901-02 (quoting <u>Southern Ry</u>., 712 F. Supp. at 1569). But the district court failed to recognize that the quoted language referred to Dr. Ekeblad's testimony in <u>Southern Railway</u> about the method for determining the <u>value</u> of real property for inclusion in the assessed to market value ratio. That language apparently did not relate to the statistical task of extrapolating the most representative ratio from a sample of ratios.

9

In Southern Railway, the statistics experts were faced with the problem of how to represent in a single ratio the assessment level in Georgia where commercial and industrial properties were assessed differently and where personal property, which was also assessed differently, was also a factor in determining the overall assessment level. In these circumstances the experts for both sides testified "that the ratio of aggregates must be used as the average to determine the level of assessment of commercial and industrial property when different types of property are combined to calculate an overall assessment level." 712 F. Supp. at 1568-69 (emphasis added). And, according to the Southern Railway court, the experts agreed "that in order to derive the ratio of aggregates for [such] property, it [was] necessary to estimate the fair market value of both commercial and industrial real property and commercial and industrial personal property." Id. at 1569 (emphasis added). In its decision, moreover, the Southern Railway court relied on the Tenth Circuit's opinion in Atchison, Topeka & Sante Fe Ry. Co. v. Lennen, 732 F.2d 1495 (10th Cir. 1984), which clearly articulated the circumstances that distinguish the statistical problem there from the one before us:

> A median has no significance if the items on the continuum are not alike in some relevant way. When, as here, categories of property that are subject to different methods of appraisal must be factored together to produce the assessment ratio for all other commercial and industrial property, each category should be factored in proportion to its share of the total true market value of all such property.

Id. at 1570 (quoting Atchison, 732 F.2d at 1504-05) (emphasis added). The Southern Railway court accordingly followed Dr. Ekeblad's suggestion and used the "ratio of aggregates" because, in the circumstances of that case, it better represented the manner in which other commercial and industrial property, real and personal, was taxed.

In this case, by contrast, no question has been raised about the proper method for estimating the true market value of the real property on the tax rolls; both parties agreed to use the sales data provided by the State's 1993 Study. The central issue presented here is what method best determines the assessed to market value ratio for com-

10

mercial and industrial property in a state where the data and assessment methods are homogeneous.

We conclude that the district court misread Dr. Ekeblad's testimony as reported in the Southern Railway case and, based upon that misreading, erroneously refused to accept both his testimony in this case and our earlier comments in Clinchfield.

We still must decide, however, whether the ratio of aggregates or the median ratio more accurately represents West Virginia's assessment level for commercial and industrial property.

V

The properties involved in this case are all real properties assessed by a single taxing authority under the same assessment standard. Although West Virginia law prescribes a uniform 60% level of assessment, no party disputes the reality that actual assessment ratios differ because of variations in the assessment process and fluctuations in market values. Under these circumstances, we conclude that the median ratio more accurately reflects the State's level of assessing multiple properties than does the ratio of aggregates.

Our conclusion is well illustrated in the record by the data presented to the district court about assessments in Putnam County, West Virginia. In 1992, there were 21 valid sales of commercial and industrial property in Putnam County. The individual assessment to market value ratios for the 21 parcels ranged from 11.99% to 239.54%, and the median ratio for the county was 47.14%. The ratio of the aggregates, however, was 82%. If the ratio of aggregates were used as the applicable measure, 76% of the taxpayers represented in the sample would actually be below "average." If only 2 of the 21 parcels, each of which sold for over $1,000,000, were removed from the sample, the sample's median ratio would move only slightly to 42.35%. But the removal of only those two properties would reduce the ratio of aggregates from 82% to 45%, and 51% of taxpayers would fall below the ratio. Using the median ratio, which evenly weighs each assessment in a sample, thus eliminates the substantial bias in favor of expensive properties that results from using the ratio of aggregates.

11

Because we conclude that the median ratio is the more accurate representation of West Virginia's assessment level than the ratio of aggregates and the parties agree that the State's 1993 Study establishes that in 1993 the median assessment ratio for other commercial and industrial property was 47.28%, the State should assess the Railroads' property at the 47.28% level.

VI

While the Railroads accept the 47.28% median ratio as a fall-back position, they argue that even that ratio is distorted by the State's practice of sales chasing. As the district court explained, "Sales chasing occurs when an assessor changes the value of an assessment in response to a sale, but does not change the assessed values of properties that do not sell." 871 F. Supp. at 900. The Railroads maintain that without sales chasing the "true level of assessment" of commercial and industrial property in West Virginia for 1993 was 37.18%.

The State denies both that sales chasing occurred in West Virginia and that its data were distorted. The district court agreed with the State. After reviewing the testimony on whether the practice occurred and on whether it distorted the State's data, the court concluded that the Railroads had "not proven clearly and convincingly, or even by a preponderance of the evidence, that Defendant's assessment calculations were tainted by sales chasing." 871 F. Supp. at 903. Because the evidence on sales chasing is at best mixed, we do not believe that the district court's finding is clearly erroneous.

Accordingly, we affirm in part, reverse in part, and remand this case for entry of judgment directing the State to use the median 47.28% assessment ratio in calculating the Railroads' 1993 ad valorem taxes.

AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED WITH INSTRUCTIONS

12